IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID R. THERKIELD, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 11-cv-5079 |
| CITY OF CHICAGO, ET AL., | ) Judge Robert M. Dow, Jr. |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a motion for summary judgment [39] filed by Defendants City of Chicago and Chicago Police Officers Nicole Henkes and Nicholas Prazuch. For the reasons set forth below, the Court grants in part Defendants' motion for summary judgment [39] and dismisses Plaintiff's federal false arrest claim (Count I). The Court dismisses without prejudice Plaintiff's state law claims for false imprisonment (Count II), malicious prosecution (Count III), respondeat superior (Count IV), and statutory indemnity (Count V).

**I.    Facts[1]**

On July 28, 2010, Lonnie Norman, the property owner and landlord of 1008 W. 68th street, called 9-1-1 and reported a crime to the Chicago police. Norman had been leasing the

---

[1] To the extent that statements in an affidavit contradict deposition testimony, the Court will not consider the affidavit in ruling on the summary judgment motions. See *Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 292 (7th Cir. 1996) ("As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony"); see also *Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 720 (7th Cir. 1998). Plaintiff's affidavit includes precisely the type of self-serving statements that the case law cited above forbids. See *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993) (finding that "[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment"). To the extent that the affidavit—which was drafted after Plaintiff's deposition and after Defendants moved for summary judgment—conflicts with the deposition testimony, it will not be considered.

basement apartment to John Pettis, an elderly man whom Norman had known for 30 years.[2] Pettis, who died in 2011, was Plaintiff David Therkield's uncle and was approximately 80 years old in July 2010. Approximately a year prior to Plaintiff's arrest, Norman observed Plaintiff coming to the apartment occasionally. The parties dispute whether Plaintiff had permission to live at the apartment, but agree that Plaintiff did not have a written lease or any written agreement stating that he could reside in the apartment. For purposes of summary judgment, the Court assumes that Plaintiff was, at least intermittently, living at the apartment without a written lease.

In his deposition, Plaintiff stated that on July 28, 2010, he was hanging out in the basement apartment with his friend, Jason Dawson, smoking cigarettes, and watching T.V. Sometime that afternoon, Norman and two unknown men entered the apartment to argue with Plaintiff about rent. Norman told Plaintiff that he was changing the locks to the basement apartment and that Plaintiff would have to leave because he did not have permission to live in the apartment.[3] Plaintiff stated that Norman and the two men began removing Plaintiff's belongings and, when he attempted to call for police, the men jumped on him, took his phone, and ripped another phone from the wall. Plaintiff further stated that he was hit repeatedly with baseball bats. Norman denies striking Plaintiff and denies that anyone else assisted him in removing Plaintiff from the building. Norman claims that Plaintiff shut the door on Norman's hand and

---

[2] Throughout his summary judgment materials, Plaintiff repeatedly refers to the basement apartment as "his home." Plaintiff has failed to present evidence that he signed a lease or rental agreement with Norman; instead, the undisputed evidence is that the property was owned by Norman, that Pettis rented the apartment from Norman, and that Plaintiff sometimes stayed with his uncle.

[3] Plaintiff maintains that he "was not given an opportunity to depose Mr. Norman," but the record belies Plaintiff's assertion. First, Norman was a defendant in this case until he was dismissed on October 16, 2012. Second, Defendants disclosed Norman as a Rule 26(a) witness on November 29, 2011, as part of their initial disclosures. Once he was disclosed, it was the responsibility of Plaintiff's counsel to secure Norman's deposition, and Plaintiff has failed to put forth any evidence that his counsel attempted to do so and was thwarted by Defendants' conduct.

threatened to punch him and vandalize the basement. Norman called 9-1-1 and reported that Plaintiff was assaulting him; Plaintiff heard Norman call 9-1-1 to request police but does not recall anything else he heard Norman say to the police.

At approximately 5:00 p.m. on July 28, 2010, Chicago Police Officers Nicholas Prazuch and Nicole Henkes were dispatched to respond to Norman's call. The dispatch informed the officers of a domestic, landlord-tenant dispute involving an assault. They were not provided with any additional details. When Officers Prazuch and Henkes, dressed in uniform and driving a marked police vehicle, arrived at the building, Norman was in the process of changing the locks on Pettis' apartment. According to the officers, Norman appeared sober and not agitated, identified himself as the landlord/owner, and reported as follows: (1) he had called 9-1-1; (2) Plaintiff was "squatting" at the apartment and using drugs in the basement; and (3) Plaintiff threatened to punch Norman in the face and destroy the basement property. When the officers encountered Plaintiff, they saw that Plaintiff was wearing hospital scrubs and a medical ID bracelet.

Officers Prazuch and Henkes maintain that Plaintiff was screaming and yelling at them; Plaintiff denies that he was yelling and screaming when the officers first encountered him and only admits to yelling at Officer Henkes in the police vehicle. Nonetheless, the officers were able to discern from Plaintiff that he claimed to live at the apartment and that Norman had beaten him with a baseball bat. After the officers spoke with Norman—a conversation that Plaintiff testified he could not hear—Officer Henkes brought Plaintiff out of the apartment for safety reasons and placed him in the police vehicle. While Plaintiff was in the vehicle with Officer Henkes, Officer Prazuch testified that he looked for the alleged baseball bat but did not find one. He also testified that he did not find any evidence that Plaintiff resided in the basement

apartment or any indication that Plaintiff actually lived there. Officer Prazuch also spoke with John Pettis, Mr. Norman's tenant, who stated that his nephew comes around. Officer Prazuch found a room in the basement with milk crates and newspapers. According to the officers, they never encountered or saw any other individuals besides Mr. Norman, Plaintiff, and John Pettis. Plaintiff maintains that the two unidentified individuals who hit him with a baseball bat were present. Plaintiff was in the police vehicle for approximately 10-15 minutes while Officer Prazuch searched the apartment.

Norman told the officers that he wanted Plaintiff arrested. At approximately 5:30 p.m., the officers arrested Plaintiff. At some point after Plaintiff was in custody, Norman signed a misdemeanor complaint against Plaintiff for simple assault. When Plaintiff was arrested, he complained of pain and stated that his arm was broken. The officers took Plaintiff to the hospital where he was treated and released and subsequently brought to the police station for processing. Plaintiff testified that he broke his arm.

On September 17, 2010, Plaintiff's criminal case was heard with ASA Maiesha Baptiste representing the State and Plaintiff appearing *pro se*. Norman and Officers Prazuch and Henkes did not appear for the hearing. ASA Baptiste did not call the officers to testify at the hearing, did not require the arresting officers' presence for court, and does not believe the officers would have even been notified for the hearing. ASA Baptiste dismissed the criminal case because she could not proceed without Norman.

On July 27, 2011, Plaintiff filed a complaint against Defendant Norman, the City of Chicago, and Defendant Officers, alleging false arrest under § 1983, false imprisonment, and malicious prosecution against Defendant Officers; respondeat superior and statutory indemnity against the City of Chicago; and a violation of Chicago's Residential Landlord Tenant Ordinance

4

and assault and battery against Defendant Norman. The Court previously concluded that the two sets of claims—those against the City Defendants and those against Defendant Norman—were not sufficiently related such that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); see 10/16/12 Mem. Opin. and Order. The Court dismissed without prejudice the claims against Defendant Norman (Counts VI and VII) and reminded Plaintiff that, pursuant to 735 ILCS 5/13-217, Plaintiff had the greater of one year or the remainder of the applicable limitations period to re-file those claims in an Illinois court.

## II. Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). On cross-motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re. United Air Lines, Inc.,* 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.,* 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Industries, Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

**III. Analysis**

Plaintiff's complaint alleges false arrest under § 1983 (Count I), false imprisonment (Count II), and malicious prosecution (Count III) against Defendant Officers and respondeat superior (Count IV) and statutory indemnity (Count V) against the City of Chicago. The Court first addresses Plaintiff's sole federal claim (false arrest) and then discusses the remaining state law counts.

**A. Plaintiff's False Arrest Claim**

Plaintiff brings a § 1983 claim against Defendant Officers for false arrest in violation of the Fourth Amendment. To prove a claim under § 1983 against the officers, Plaintiff must show that a person acting under color of state law deprived him of a right, privilege, or immunity secured either by the Constitution or federal law. See, *e.g. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). Defendant Officers do not dispute that they were acting under color of state law at the time of Plaintiff's arrest. Rather, they argue that they had probable cause for Plaintiff's arrest.

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v.*

6

*City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) (citing *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997)). "This is so even where the defendant officers allegedly acted upon a malicious motive." *Id.* (citing *Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir. 1993)). Police officers have probable cause to arrest an individual when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed" an offense. *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998). The Court evaluates probable cause "not on the facts as an omniscient observer would perceive them," but rather "as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he saw, hearing what he heard." *Id.*; see also *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000); *United States v. Reis*, 906 F.2d 284, 289 (7th Cir. 1990) (courts determine the existence of probable cause by applying an objective standard; it is the mindset of the "reasonable officer" and not of the actual arresting officer that matters). The test, an objective one, is whether a reasonable officer would have believed the person had committed a crime. If the test is satisfied "the arrest is lawful even if the belief would have been mistaken." *Kelly*, 149 F.3d at 646. Thus probable cause has been described as a zone within which reasonable mistakes will be excused. *Id.*

In this case, Defendant Officers Prazuch and Henkes responded to a call reporting an assault involving a landlord/tenant dispute. The officers encountered Norman, who engaged the officers, identified himself as the building owner, told the officers he had called 9-1-1, and directed them to Plaintiff. Norman claimed that he had been assaulted by Plaintiff, who had threatened to punch him in the face and threatened to damage the basement apartment. Norman also reported that Plaintiff had been squatting at the building, did not have permission to be

7

there, and had been using the basement apartment to do drugs. He asked the officers to arrest Plaintiff.

When the officers encountered Plaintiff, he was wearing hospital scrubs and an ID bracelet. He insisted that he had been hit with a baseball bat by Norman and that he lived at the apartment. The officers testified that they did not notice any visible injuries to Plaintiff; nevertheless, once Officer Henkes secured Plaintiff, Officer Prazuch entered the apartment to look for the bat and any evidence that Plaintiff lived there or that the attack that Plaintiff described had occurred. Officer Prazuch testified that he did not find any evidence that Plaintiff lived there and did not find a baseball bat. Furthermore, while in the basement apartment, Officer Prazuch spoke with Pettis, who stated that Plaintiff was his nephew.

Plaintiff's primary argument is that the officers lacked probable cause because they conducted an insufficient investigation. See Pl. Resp. at 5-17. To support this argument, Plaintiff claims that the officers failed to "obtain some evidence that the accused had the required mental state at the time the offense was committed." Plaintiff also argues that a jury could find that Plaintiff was the victim and not the offender. Finally, Plaintiff argues that the officers failed to question him, or other available witnesses, who would have, in Plaintiff's version, revealed that Norman battered Plaintiff. At summary judgment, Plaintiff has not presented any witness accounts that support his version of the events beyond his own deposition testimony and later-filed affidavit.

The officers testified that they found Norman to be credible, as he engaged the officers when they encountered him, appeared sober, was not agitated, and was in the process of changing the locks at the building. In other words, there was nothing regarding the circumstances surrounding Norman's report that would have cast doubt on his complaint that he

had been the victim of a crime by a man who did not belong at the apartment. In contrast, when the officers encountered Plaintiff, he was wearing hospital scrubs and a medical ID bracelet. Even accepting Plaintiff's contention that he never yelled prior to being removed from the apartment for safety reasons, he admitted in his deposition to being upset and yelling at Officer Henkes while in the police vehicle. Upon hearing Plaintiff's version of the events, Officer Prazuch spent 10-15 minutes searching the apartment, but did not find either a baseball bat or any evidence to corroborate Plaintiff's claim that he was living in the apartment. Plaintiff's uncle, the actual tenant, told Officer Prazuch that Plaintiff stays at the apartment, but that is not inconsistent with Norman's claim that Plaintiff was not on the lease or rental agreement. While Plaintiff may insist that he lived at the apartment, the officers did not have any information beyond Plaintiff's statements that could have put them on notice that Norman's recitation of the circumstances, including as to Plaintiff's legal relationship to the premises (or lack thereof), was not accurate. Moreover, whether Plaintiff was lawfully in the apartment is immaterial to the charges made and pressed by Norman for which Plaintiff was arrested; even those lawfully present at a scene do not have a right to commit an assault, as Norman insisted took place.

In refusing to accept Plaintiff's version of the events, the officers did not commit a Fourth Amendment violation. As the Seventh Circuit establishes, "police officers need not exclude every suggestion that a victim is not telling the truth. Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established." See *Spiegel v. Cortese*, 196 F.3d 717, 724-25 (7th Cir. 2000). "The idea * * * is that police often encounter competing and inconsistent stories. One person makes an accusation; another denies it; police on the scene must act yet lack the tools to determine immediately where the truth lies. The Constitution permits them to initiate the

criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges, and juries in the criminal prosecution." *Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006) (holding officers had probable cause to arrest based on witness identification). "Consequently, the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage." *Spiegel*, 196 F.3d at 724-725, 727 (reversing trial court's denial of officer's summary judgment motion and holding officer immune for arrest based on victim's complaint) ("The credibility of a putative victim or witness is a question, not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial."). The Seventh Circuit has "refuse[d] to require law enforcement officers to delay arresting a suspect until after they have conclusively resolved each and every inconsistency or contradiction in a victim's account." *Id.*[4]

Plaintiff also argues that the mental state of a crime must be established before an officer can make an arrest. Plaintiff misapprehends Fourth Amendment law. Indeed, cases upon which Plaintiff relies refute this very argument. See *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) (affirming summary judgment in favor of arresting officers, rejecting plaintiff's argument that probable cause was lacking because she did not have the requisite criminal intent, and stating "[p]olice have a hard time evaluating competing claims about motive; they are entitled to act on the basis of observable events and let courts resolve conflicts about mental states."); see also *Spiegel*, 196 F.3d at 725 n.1. "[W]hen an officer has received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994) (stating "[t]hough we have suggested that evidence of interviews and investigations may

---

[4] In his response brief, Plaintiff also relies on *Spiegel*. However, Plaintiff cites the district court's opinion denying summary judgment and fails to account for the fact that the decision was reversed on appeal and the officer was afforded qualified immunity. See *Spiegel*, 196 F.3d at 727.

be a relevant factor in a probable cause analysis, it is not in any way a prerequisite to a finding of probable cause.") (citations omitted). Here, Officer Prazuch at least minimally checked into Plaintiff's statements but found nothing to dissuade him from his conclusion that Norman was credible and that probable cause for Plaintiff's arrest existed.

Even assuming there is some question as to the existence of probable cause, Defendant Officers argue that they are entitled to qualified immunity for their conduct in arresting Plaintiff. "Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known." *Fleming v. Livingston Cnty., Ill.,* 674 F.3d 874, 879 (7th Cir. 2012); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)) (precluding liability "if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the officers possessed."). As a general matter, the doctrine of qualified immunity can shield public officials like Defendants from civil liability if they can demonstrate that they were performing a discretionary function and that a reasonable law enforcement officer in their position would have believed that, at the time he acted, his actions were within the bounds of the law. *Belcher v. Norton,* 497 F.3d 742, 749 (7th Cir. 2007). As the Supreme Court recently reiterated, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender,* ––– U.S. ––––, ––––, 132 S.Ct. 1235, 1244 (2012) (quotations omitted).

Claims of qualified immunity involve two questions: (1) whether the officials' conduct violated a constitutional right, and (2) whether the right was clearly established at the time. *Surita v. Hyde,* 665 F.3d 860, 868 (7th Cir. 2011). The Court may consider these questions in

any order, *Reher v. Vivo,* 656 F.3d 772, 775 (7th Cir. 2011), and a negative answer to either question entitles the officials to the defense. *Hanes v. Zurick,* 578 F.3d 491, 493 (7th Cir. 2009); *Cleveland v. Swanson*, 2013 WL 2421752, at *4 (N.D. Ill. June 3, 2013). For purposes of qualified immunity as related to a false arrest claim, "[i]f the officers can establish that they had 'arguable probable cause' to arrest the plaintiff, then the officers are entitled to qualified immunity, even if a court later determines that they did not actually have probable cause." *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001). Under all the circumstances detailed above, at a minimum, "arguable" probable cause to arrest Plaintiff existed on July 28, 2010, such that a reasonable officer in the same circumstances as confronted Officers Prazuch and Henkes could have reasonably believed their actions to be lawful.

### B. Plaintiff's State Law Claims

Because the Court grants summary judgment to Defendants as to the sole claim (Count I) over which it has original jurisdiction, it must now address whether to retain jurisdiction over Plaintiff's remaining state law claims. See 28 U.S.C. § 1367(c)(3). In addition to the federal claim for false arrest, Plaintiff has asserted state law claims for false imprisonment (Count II), malicious prosecution (Count III), respondeat superior (Count IV), and statutory indemnity (Count V).

The Seventh Circuit consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.*,6 F.3d 1176, 1182 (7th Cir. 1993). Finding no justification for

departing from that "usual practice" in this case,[5] the Court dismisses without prejudice Plaintiff's state law claims for false imprisonment (Count II), malicious prosecution (Count III), respondeat superior (Count IV), and statutory indemnity (Count V).

### III. Conclusion

For these reasons, the Court grants in part Defendants' motion for summary judgment [39] and dismisses Plaintiff's federal false arrest claim (Count I). The Court dismisses without prejudice Plaintiff's state law claims for false imprisonment (Count II), malicious prosecution (Count III), respondeat superior (Count IV), and statutory indemnity (Count V).

Dated: July 31, 2013

_____
Robert M. Dow, Jr.
United States District Judge

---

[5] In *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point to a federal decision of the state-law claims on the merits." The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id.* at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to re-file those claims in state court. See 735 ILCS 5/13-217; *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice also is appropriate here because substantial judicial resources have not been committed to the state law counts of Plaintiff's complaint. *Wright*, 29 F.3d at 1251.